UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Tommy Best, | ) | |
| | ) | Civil Action No. 9:02-2095-SB |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **MEMORANDUM OF DECISION** |
| | ) | **ON BENCH TRIAL** |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

INTRODUCTION

This matter came before the Court for Bench Trial on October 5, 2004. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact, conclusions of law, and judgment.

FINDINGS OF FACT

1. The Plaintiff, Tommy Best, resides in Burton, South Carolina, and worked as a manual laborer until the time of the accident that gave rise to these proceedings. He began working for Moody and Sons, Inc. in or around 1996, burying telephone cable. (Best Deposition, Page 10). Moody and Sons, Inc. installs telephone wiring, cable TV wiring, underground power, streetlight circuits and streetlights. (Trial Transcript, Page 100, Line 13).

2. On June 25, 1997, the Plaintiff was working for Moody and Sons, Inc. and had been assigned two jobs that day, both of which were to be performed by a three-man crew (Trial Transcript, Page 101, Line 14). In the course of work that day,



the Plaintiff was the passenger in a pickup truck (Trial Transcript, Page 14, Lines 8-14) that was being driven by Johnny Sheffield, another employee of Moody and Sons, Inc. (Trial Transcript, Page 102, Line 8).

3. Sheffield and the Plaintiff were sitting at a stoplight when the Plaintiff felt a bump and heard a crash. (Best Deposition, Page 28, Line 22). The Plaintiff's vehicle was struck in the rear by a United States Navy vehicle being driven by Master Sargent Paul Black, United States Marine Corps.

4. The accident was described by the Plaintiff's attorney as "a low impact wreck" (Trial Transcript, Page 4, Line 19), and the Plaintiff testified that "it didn't feel like nothing [sic] at the time." (Trial Transcript, Page 16, Line 5).[1] The Plaintiff did not need any medical assistance at the scene (Trial Transcript, Page 16, Line 12) and did not report that he was in any pain. (Best Deposition, Page 33, Line 18).

5. Paul Black explained that while waiting for light to turn, he reached over to get something, accidentally lifted his foot off the brake pedal and, as a result, rolled into the Plaintiff's vehicle. (Trial Transcript, Page 103, Line 5).[2]

6. There was no damage to the rear-end of the vehicle in which the Plaintiff

---

[1] The Plaintiff stated in his deposition that he believed the other vehicle was traveling at a speed of at least 40 mph at the point of impact (Best Deposition, Page 33, Line 11), but since he didn't see the government vehicle coming toward the pickup truck, he admits that he really has no idea how fast it was traveling. (Best Deposition, Page 32, Line 24 through Page 33, Line 1).

[2] The Plaintiff, one the other hand, believes that Paul Black was attempting to change lanes in order to make a right hand turn onto State Road 280 toward Parris Island. (Best Deposition, Page 32, Line 3). Although the Plaintiff did not observe the government vehicle rear-end their vehicle, he heard Johnny Sheffield say, "This guy is going to hit us." The Plaintiff bases this opinion on those words and his presence at the scene. (Best Deposition, Page 31, Line 22 through Page 32, Line 8). Because the Plaintiff did not see the accident, and because the driver of the car is in the best position to proffer a reason for striking the car in front of him, Paul Black's version of these facts will be accepted as true.



was riding. (Trial Transcript, Page 15, Line 2; Page 103, Line 10). The government vehicle sustained some minor damage where its grill struck the pintle hitch of the other vehicle. (Trial Transcript, Page 15, Line 3; Page 105, Line 16). Other accounts indicate there may have been some damage to the radiator and/or the hood of the government vehicle. (Trial Transcript, Page 15, Line 23).

7. After the police made a report of the accident, the Plaintiff went to the second job site of the day, (Trial Transcript, Page 16, Line 17), where he attempted to bury telephone cable using post-hole diggers and "possibly a shovel." (Trial Transcript, Page 55, Lines 12-23). In attempting to bury the cable, the Plaintiff tried to dig through bedrock for an hour to an hour and-a-half.[3] (Trial Transcript, Page 55, Line 24 through Page 56, Line 2). He stopped working around 3:00 or 3:30 p.m. (Trial Transcript, Page 56, Line 23). The Plaintiff went home immediately after returning to the shop. (Trial Transcript, Page 57, Line 2). The Plaintiff rode his bike most of the way home after work and did not experience any pain at that time. (Best Deposition, Page 34, Line 23 through Page 35, Line 9).

8. After being home for three to four hours, (Trial Transcript, Page 59, Line 22), the Plaintiff experienced a sharp pain in his back while bending over in an attempt to remove his boots. (Trial Transcript, Page 57, Line 20). Immediately following this episode, the EMS was called.[4] (Trial Transcript, Page 58, Line 2). The

---

[3] The Plaintiff contradicts himself here, as he testified at deposition before trial that he only laid out materials at the second job site to be used the following day. (Best Deposition, Page 34, Line 5).

[4] Contradicting himself again, the Plaintiff testified at his deposition before trial that he called the EMS within one to two hours after he left work that day.

EMS took the Plaintiff to Beaufort Memorial Hospital the night of June 25, 1997, arriving at 8:56 p.m., (Trial Transcript, Page 59, Lines 11-18) (Defendant's Exhibit 6), at which time the Plaintiff was treated for neck and back pain. (Best Deposition, Page 36, Line11).

9. The Plaintiff returned to the Beaufort Memorial Hospital two days later, on June 27, 1997, with identical complaints about his neck and back. (Trial Transcript, Page 60, Line 15). The Plaintiff had not filled his prescription for Vicodin ES and the Emergency Department Record states that the Plaintiff "basically came back to the ER without following the doctor's instructions." (Trial Transcript, Page 61, Line 13) (Defendant's Exhibit 7). The Plaintiff later testified that he would have filled the Vicodin prescription if he could have afforded it. (Trial Transcript, Page 96, Line 5).

10. Although the Plaintiff was subsequently treated by one chiropractor and four doctors, he only informed them about the motor vehicle accident and omitted all other information concerning his medical history. The Plaintiff failed to inform any of the doctors about two previous work-related injuries he suffered to his back, both of which required medical treatment. The first occurred on April 5, 1995 when he received treatment after lifting heavy objects at work. The second occurred on January 30, 1997 when he received treatment for a work-related roofing accident. (Trial Transcript, Page 12, Line 6 through Page 13, Line 3) (Defendant's Exhibit 8).

11. The Plaintiff also failed to inform any of his treating physicians about several subsequent incidents of trauma/injury he suffered after the accident. Those incidents are as follows:

(1) On October 1, 1998, the Plaintiff received medical treatment at the



4

Beaufort County Detention Center for injuries to his mouth and neck sustained in a fight with another inmate (Trial Transcript, Page 71, Lines 2-17);[5]

(2) On November 18, 1998, the Plaintiff received medical treatment for injuries to his back sustained as a result of sleeping on a hard cot (Trial Transcript, Page 72, Lines 7-14);

(3) On December 11, 1998, the Plaintiff received medical treatment for injuries to his back, neck and arms from a slip-and-fall in the shower area at the Beaufort County Detention Center (Trial Transcript, Page 72, Lines 15-22);

(4) On May 1, 1999, the Plaintiff received medical treatment for injuries sustained in a fight with another inmate (Trial Transcript, Page 72, Line 2); and

(5) On May 25, 1999, the Plaintiff received medical treatment for a broken finger sustained in a fight with another inmate. (Trial Transcript, Page 75, Line 18).

12. The Plaintiff saw Dr. Mark Carey, a chiropractor, for medical treatment on June 30, 1997.[6] (Trial Transcript, Page 62, Line 14) (Defendant's Exhibit 8). He indicated on the patient information form that he was covered by Farm Bureau Insurance.[7] (Trial Transcript, Page 63, Line 7) (Defendant's Exhibit 7). Also, the Plaintiff checked off every symptom listed on this form, except chest pain and

---

[5] The Plaintiff testified at his deposition before trial that he had been in only one fight since June 25, 1997, in which he swung at his brother, missed, fell down and hurt his back and neck. (Best Deposition, Page 45, Line 25 through Page 46, Line 9). This is untrue; the Plaintiff has been in five fights since June 25, 1997 and testified to this effect at trial.

[6] The Plaintiff contradicts himself, as he testified at his deposition before trial that he did not see anyone else regarding his back and neck after Beaufort Memorial for about two months, and even then the Plaintiff stated he saw Dr. Leland C. Stoddard, not Dr. Carey.

[7] While this is untrue, the Plaintiff testified that he believed Farm Bureau was his employer's worker's compensation insurance company, so he wrote it on the form. (Trial Transcript, Page 63, Line 14).

arthritis. (Defendant's Exhibit 8). Dr. Carey testified in his deposition that this response was "not typical." (Carey Deposition, Page 10, Lines 5-8). Dr. Carey did not review the Plaintiff's past medical records and was never informed of any of the Plaintiff's prior or subsequent injuries. (Carey Deposition, Page 27, Line 20 through Page 28, Line 3).

13. Dr. Carey treated the Plaintiff's neck, or cervical spine, and his middle and lower back. (Carey Deposition, Page 13, Line 15). The primary goal of Dr. Carey's treatment was to rid the patient of muscle pain, inflammation, and help him regain joint mobility. (Carey Deposition, Page 14, Line 8).

14. Dr. Carey ordered an MRI scan of the Plaintiff's lumbar region and <u>not</u> the cervical area, because the former was his main complaint at the time (Carey Deposition, Page 25, Line 9), and because his neck pain had "improved some." (Carey Deposition, Page 25, Line 24 through page 26, Line 8). After the MRI was performed on July 31, 1997, Dr. Carey met with the Plaintiff on August 5, 1997 (Carey Deposition, Page 26, Lines 10-14) and noted that there was a disc bulge at L5-S1 in the lower back. (Carey Deposition, Page 26, Line 18).

15. Dr. Carey testified that he believed – based on his education and training, the Plaintiff's intake form and the treatment received – that, to a reasonable degree of chiropractic certainty, the Plaintiff's injuries were caused by the motor vehicle accident. (Carey Deposition, Page 32, Line 16). Again, the Plaintiff only indicated on the patient intake form that he had been in an accident and that he had not "had this problem before." (Defendant's Exhibit 8). As discussed above, this is not true, because the Plaintiff had suffered two work-related injuries to his back prior to the



motor vehicle accident.

16. The Plaintiff then went to Dr. Leland C. Stoddard for an independent medical evaluation. (Stoddard Deposition, Page 9, Line 10). The Plaintiff's first visit to Dr. Stoddard's office was on August 20, 1997, (Trial Transcript, Page 69, Line 11) (Defendant's Exhibit 9), at which time the Plaintiff complained of neck and back pain. The Plaintiff related his pain solely to the accident. (Stoddard Deposition, Page 10, Lines 18-25).

17. On August 20, 1997, Dr. Stoddard reviewed the July 31, 1997 MRI report (Stoddard Deposition, Page 12, Line 4; Page 14, Line 18), and testified that it showed some dessication and bulging at L5-S1 (Stoddard Deposition, Page 12, Line 18). He also testified that it was impossible to determine whether this injury was caused by the motor vehicle accident. (Stoddard Deposition, Page 14, Line 21 through Page 15, Line 7). Dr. Stoddard did not have any other medical records to review. (Stoddard Deposition, Page 12, Line 11).

18. Dr. Stoddard referred the Plaintiff to physical therapy to allay some of his pain, but has no indication that the Plaintiff actually attended a session. (Stoddard Deposition, Page 15, Line 18 – Page 16, Line 6). The Plaintiff testified that he believes he went through half of a session of physical therapy but "was in too much pain to go through with it." (Best Deposition, Page 38, Line 2).

19. Dr. Stoddard assigned the Plaintiff a 10% impairment rating, using the American Medical Association's permanent impairment rating system. He based this rating primarily on the Plaintiff's subjective complaints, and partially on the structural damage that could be seen on the MRI of his lower back. (Stoddard Deposition,

7

Page 20, Line 3; Page 19, Line 17). The 10% rating was divided into a 5% impairment to the neck and a 5% impairment to the lower back. (Stoddard Deposition, Page 19, Line 22).

20. Dr. Stoddard believed the motor vehicle accident was merely a "possible cause" of the Plaintiff's pain. (Stoddard Deposition, Page 30, Lines 6-25). He testified that he is only in a position to state that the Plaintiff's neck and back pain are related to the accident based on the history that the Plaintiff gave him. (Stoddard Deposition, Page 31, Line 8).

21. Dr. Stoddard treated the Plaintiff for his neck and back injuries in 1999 and 2000, after his five subsequent incidents of trauma/injury (discussed above),[8] but failed to inform him about any of those intervening events. (Stoddard Deposition, Page 21, Line 23; Page 20, Line 5; Page 22, Line 2).

22. Dr. Nicholas E. Mihelic, an orthopedic surgeon, saw the Plaintiff for the first time on August 2, 2000, at which time the Plaintiff complained of "low back pain and spasm, [ ] neck pain and spasm, with arm and leg radiating pain," which had been present since the accident on June 25, 1997. (Mihelic Deposition, Page 5, Line 15).

23. The Plaintiff did not inform Dr. Mihelic of other hospitalizations or injuries aside from the motor vehicle accident. In fact, the Plaintiff only informed him that he was an HIV patient and had undergone some antiviral treatments. (Mihelic Deposition, Page 26, Line 12; Page 6, Line 22). Thus, although Dr. Mihelic believes



---

[8] Dr. Stoddard treated the Plaintiff on November 17, 1999, May 12, 2000 and June 21, 2000.

to a "degree of medical certainty" that the pain of which the Plaintiff complains is related to the motor vehicle accident, this is the only injury of which Dr. Mihelic was aware. (Mihelic Deposition, Page 47, Line 18). Dr. Mihelic testified that having information about all falls, fractures, hospitalizations, surgeries, and injuries that required surgery is helpful in determining the cause of an injury. (Mihelic Deposition, Page 27, Line 14).

24. Dr. Mihelic indicated that the Plaintiff's subjective complaints were not consistent with his clinical observation. For instance, the Plaintiff complained that he had trouble standing on his toes, but then did so at Dr. Mihelic's request; Dr. Mihelic further tested for muscle weakness in the Plaintiff's toes and heels and concluded that the Plaintiff "really could do everything." (Mihelic Deposition, Page 9, Lines 15-21).

25. Dr. Mihelic took x-rays of the Plaintiff, which showed some joint space narrowing with bone spurs at the two lower spinal vertebrae between C5-C6 and C6-C7. (Mihelic Deposition, Page 11, Line 20). Dr. Mihelic also noted that the Plaintiff has a "relatively straight" neck, which is "usually an indirect sign of muscle spasm" there. (Mihelic Deposition, Page 12, Line 5).

26. Dr. Mihelic ordered two MRI scans, one for the lumbar spine and one for the cervical spine, which were performed on August 4, 2000. (Mihelic Deposition, Page 13, Line 5). Dr. Mihelic testified that the MRI report of the lumbar spine showed degenerative disc disease and dessication, and the MRI report of the cervical spine showed a focally herniated nucleosis pulposis, which is a ruptured disc. (Mihelic Deposition, Page 14, Line 11). Dr. Mihelic believes the herniated



nucleosis pulposis to be "most likely related" to the accident, based on the history that the Plaintiff gave to him. (Mihelic Deposition, Page 18, Line 19). Dr. Mihelic also testified that he believes the degenerative disc disease in the Plaintiff's low back and neck preexisted the wreck (Mihelic Deposition, Page 32, Line 22).

27. Dr. Mihelic testified that he believes the only new condition created by the accident was the ruptured disc in his neck at C5-C6. (Mihelic Deposition, Page 45, Line 1). His belief that the Plaintiff suffered nerve injury to his neck in the accident is based on the forces involved with extension/flexion during a car accident, which can "whip[ ]" a person's head forward. (Mihelic Deposition, Page 37, Line 10). Dr. Mihelic testified that other events can cause a person's head to undergo the same type of extension/flexing that a car accident can produce. By way of example, he stated this can happen where "you miss a wake in your boat," become "airborne and hit the water," or slip and fall, or if one is hit from the side or behind, or put into a headlock and wrestled to the ground, or punched in the head. (Mihelic Deposition, Page 40, Line 6).

28. Dr. Eugene Eline, a Board Certified orthopedic surgeon, treated the Plaintiff on four occasions: April, 6, 2001, May 4, 2001, July 13, 2001, and August 29, 2001. (Eline Deposition, Page 10, Line 14 through Page 11, Line 5).

29. When the Plaintiff saw Dr. Eline for the first time on April 6, he complained of neck and back pain and related those pains to the car accident. (Eline Deposition, Page 12, Lines 3-11). Although prompted by Dr. Eline's patient information form to indicate past injuries and any work-related injuries to the back or neck area, the Plaintiff failed to indicate anything other than the car accident.



(Eline Deposition, Page 13, Lines 2-11). In this regard, the Plaintiff failed to be forthright on the form, because, in fact, the Plaintiff had received medical treatment for two prior work-related injuries to his back, as discussed above, and had been treated for the five incidents of trauma/injury as listed above.

30. Based on the incomplete information Plaintiff gave Dr. Eline, he diagnosed the Plaintiff with cervical paraspinal muscle tenderness and lumbar paraspinal muscle tenderness and attributed these conditions to the motor vehicle accident. (Eline Deposition, Page 17, Line 17 through Page 18, Line 16). Dr. Eline, however, never ran tests on the Plaintiff that would establish causation of the pains of which he complained. As Dr. Eline explained, "that is a different type of medical exam" with "different parameters, different questions, [and] a different level of history taking and records review." (Eline Deposition, Page 19, Lines 4-14).

31. On the May 4 visit, Dr. Eline recommended an MRI scan of the Plaintiff's neck and lower back. (Eline Deposition, Page 27, Line 12). The MRI was performed and it showed a paracentral disc herniation at the C5-C6 level, a little narrowing at the C3-C4 and C4-C5 level, disc degeneration at L4-L5 and L5-S1, and a bulging disc at L4-L5 (Eline Deposition, Page 28, Line 8 through page 29, Line 17).

32. Dr. Eline testified that the L4-L5 degenerative disc bulge and L5-S1 could be caused by a number of events, but he could not point to a specific triggering event. (Eline Deposition, Page 31, Line 18). Dr. Eline believes that it is possible that a job such as digging ditches and handling heavy spools could cause enough repetitive stress to induce disc degeneration. (Eline Deposition, Page 22, Line 8). Dr. Eline related the exacerbation of the Plaintiff's preexisting lumbar degenerative



disc disease to the accident, based on the history the Plaintiff gave to him. (Eline Deposition, Page 44, Line 14).

33. Dr. Eline testified that the impact of a fist fight to a person's upper extremities, including head, jaw, or teeth, where the victim's head was rocked back and forth, potentially could be consistent with an accident that could cause such neck strains. (Eline Deposition, Page 38, Line 15). Dr. Eline testified that it would be difficult to distinguish the cause of the Plaintiff's injuries where he had been in a car accident and had also been in a fist fight, because either one could have caused the damage. (Eline Deposition, Page 50, Line 20 through Page 52, Line 17).

34. Dr. Eline did not express any opinion concerning the Plaintiff's cervical spine complaints, because he had insufficient data to make any such statements about the condition of the Plaintiff's neck. (Eline Deposition, Page 47, Line 21 through Page 48, Line 11).

35. Dr. Karen Eller is board certified in anesthesia and pain management, and treated the Plaintiff once on January 9, 2002. (Eller Deposition, Page 8, Line 2). She had a few pieces of the Plaintiff's history from 1997, 1999 and 2000, which she received from Dr. Stoddard. (Eller Deposition, Page 9, Line 10). Dr. Eller also had the Plaintiff's MRIs from 1997 and 2000. (Eller Deposition, Page 9, Line 22).

36. The Plaintiff informed Dr. Eller only of the 1997 accident and attributed all of his pain to that accident. (Eller Deposition, Page 13, Line 17). He reported that since the accident, he has suffered burning/shooting pain in his neck, arms, lower back and down into his legs, (Eller Deposition, Page 10, Line 7), but failed to inform Dr. Eller of the other incidents of trauma or injury. (Eller Deposition, Page 10, Line

12

18 through Page 11, Line 3).

37. Dr. Eller stated that, based on the Plaintiff's patient history, which indicated he had no pain before the accident and had pain after the accident, she established "cause and effect." (Eller Deposition, Page 14, Line 7). That is to say, Dr. Eller believes that the Plaintiff's pain was "probably" caused by the "force of the accident," and she bases that opinion on the information the Plaintiff relayed to her. (Eller Deposition, Page 23, Line 17 through Page 24, Line 7).

38. Although Dr. Eller set up a plan to help the Plaintiff's pain, he never returned to her for treatment. (Eller Deposition, Page 18, Line 17). Dr. Eller scheduled three injections (lumbar epidurals), but the Plaintiff did not show up for any of those appointments. (Eller Deposition, Page 19, Line 8).

39. Dr. Donald R. Johnson, a Board Certified orthopedic and spinal surgeon, testified on behalf of the Defendant. (Johnson Deposition, Page 7, Line 7). He had all of the Plaintiff's medical records and history that were produced in the discovery phase of this case. (Johnson Deposition, Page 9, Line 23 – Page 10, Line 1). He never treated the Plaintiff for the injuries giving rise to this lawsuit.

40. Dr. Johnson offered two substantive opinions: 1) he cannot state to a reasonable degree of medical certainty that the injuries complained of are a direct result of the motor vehicle accident in June 1997, and 2) he cannot state that, but for the accident, the Plaintiff would not be experiencing the same injuries. (Johnson Deposition, Page 9, Lines 14-22).

41. Dr. Johnson reviewed the July 31, 1997 MRI and stated that it "does not show an acute, traumatic type of lining;" it shows "a pre-existing degenerative, i.e.[,]



arthritic condition in the bottom disc of a gentleman who [ ] has a history of doing heavy physical and manual labor." (Johnson Deposition, Page 12, Line 22 – Page 13, Line 1). Dr. Johnson believes the preexisting disc degeneration in the Plaintiff's lumbar spine was not exacerbated by the motor vehicle accident, as the MRI does not show an acute injury. (Johnson Deposition, Page 36, Line 5). Also, Dr. Johnson found "no evidence" indicating that the Plaintiff had a preexisting cervical spine condition. (Johnson Deposition, Page 35, Line 22).

42. Although Dr. Johnson did not have the benefit of reviewing any MRIs or X-rays that may have been taken as a result of the January 30, 1997 work-related back injury, (Johnson Deposition, Page 17, Line 22), he testified that this injury was significant, because it happened just several months prior to the car accident. (Johnson Deposition, Page 16, Line 7). He further testified that it is impossible to distinguish between the two injuries, at least insofar as establishing which injury was directly related to the pain of which the Plaintiff complains. (Johnson Deposition, Page 17, Line 16).

43. Dr. Johnson testified that the 2001 MRI was significant because the Plaintiff's treating physician at that time, Dr. Eline, believed the source of the pain to be the disc between lumbar four and five, but this condition did not exist on the 1997 MRI. Thus, during the course of the Plaintiff's treatment different sources of pain have been identified. (Johnson Deposition, Page 21, Lines 8-24).

44. Dr. Johnson reviewed the medical records which showed that the Plaintiff was in a fight on October 1, 1998, slipped and fell in the shower area at the detention center on December 11, 1998, was in a fight on May 1, 1998, was in a



fight on May 25, 1999, and was in a fight on November 28, 2000. Dr. Johnson believes that a fight, a slip-and-fall, or a fight which results in mouth lacerations can injure a disc. (Johnson Deposition, Page 27, Lines 8-24). Dr. Johnson testified that being informed of the traumatic events the Plaintiff suffered after the 1997 motor vehicle accident assisted him in forming his opinions and agreed that "they make a difference." (Johnson Deposition, Page 30, Lines 17-23).

45. Dr. Johnson agreed with the 10% impairment rating that Dr. Stoddard assigned the Plaintiff, given what information Dr. Stoddard knew about the Plaintiff. (Johnson Deposition, Page 37, Lines 12-25).

46. The Plaintiff admitted at trial that some of the answers he gave in the companion Worker's Compensation case were not truthful. The Plaintiff testified at deposition that he had never experienced any back/neck pain before the motor vehicle accident, then admitted at the trial of this case that this statement was untrue. (Trial Transcript, Page 51, Lines 7-12; Best Worker's Compensation Deposition, Page 9, Line 22 – Page 10, Line 3). Also, the Plaintiff testified at his Worker's Compensation deposition that he had never had any problems with his neck or back prior to the motor vehicle accident, but admitted at trial that this statement was untrue. (Best Worker's Compensation Deposition, Page 10, Line 10; Trial Transcript, Page 51, Lines 13-23).

47. The Plaintiff admitted at the trial of this case that he had also been untruthful at his deposition in the Worker's Compensation companion case when he stated he had never had any other prior physical problems other than HIV, heart problems and the pain he relates to the motor vehicle accident. (Trial Transcript,

15

Page 53, Lines 1-17; Best Worker's Compensation Deposition, Page 55, Line 17 – Page 56, Line 1).

48. The Plaintiff admitted at trial that he made inconsistent statements at his deposition in this case. (Trial Transcript, Page 53, Line 18). Specifically, the Plaintiff failed to indicate that he had suffered any work-related injuries prior to the June 25, 1997 accident. (Best Deposition, Page 12, Lines 8-13). At trial, the Plaintiff indicated that he did not remember the previous work-related injuries on the day of his deposition. (Trial Transcript, Page 92, Lines 3-21).

49. At his deposition, the Plaintiff indicated he was only in one fight after the accident and only slipped and fell once since the accident, both of which were untrue. (Best Deposition, Page 45, Line 25 – Page 46, Line 2; Page 47, Line 15).


## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties under the Federal Tort Claims Act, see 28 U.S.C. §1346(b), because the driver of the offending vehicle, acting as an employee of the Government at the time of the accident, would have been liable to the Plaintiff under the laws of South Carolina if he had been acting as a private person at that time. In addition, under the FTCA, South Carolina law will govern the issues in this case.

2. A plaintiff in a negligence action must prove by a preponderance of the evidence that (1) a duty existed between the Plaintiff and the Defendant, (2) there was a breach of this duty, (3) the Plaintiff's injuries were proximately caused by the breach, and (4) the Plaintiff was damaged. See Shipes v. Piggly Wiggly St.

Andrews, Inc., 238 S.E.2d 167, 168 (S.C. 1977). Here, there is no dispute that the driver of the Government vehicle rear-ended the vehicle in which the Plaintiff was a passenger, in breach of the common law duty to operate a vehicle in a safe manner. The crucial issue of law in this case Is whether the rear-end collision was the proximate cause of the injuries the Plaintiff relates to that accident, and if so, to what extent these damages were caused by the accident.

3. In accordance with the elements of a negligence action, South Carolina courts hold that "[n]egligence is not actionable unless it is a proximate cause of the injury." Bishop v. S.C. Dep't of Mental Health, 502 S.E.2d 78, 83 (S.C. 1998) (citing Hanselmann v. McCardle, 267 S.E.2d 531 (S.C. 1980)). "Proximate cause requires proof of both causation in fact and legal cause." Id. (citing Oliver v. S.C. Dep't of Highways and Pub. Transp., 422 S.E.2d 128 (S.C. 1992)). "Causation in fact is proved by establishing the injury would not have occurred 'but for' the defendant's negligence." Id.

4. Similarly, "[l]egal cause is proved by establishing foreseeability." Id. "Foreseeability is determined by looking to the natural and probable consequences of the complained of act." Id. (citing Koester v. Carolina Rental Ctr., Inc., 443 S.E.2d 392 (S.C. 1994)). As long as the Plaintiff proves that the Defendant's negligence was one of the proximate causes of his injury, he has satisfied the proximate cause requirement. See id. And again, the burden of proof lies with the Plaintiff to establish proximate cause by a preponderance of the evidence. See Shipes v. Piggly Wiggly St. Andrews, Inc., 238 S.E.2d 167, 168 (S.C. 1977).

5. Turning to the first prong of the conjunctive test for proximate cause, the



17

Plaintiff is required to establish that the negligence of the government driver, i.e., the motor vehicle accident, was the cause in fact, or the "but for" cause, of the injuries the Plaintiff relates to the accident. Generally, "[p]roof of a causal connection must be something more than evidence consistent with the plaintiff's theory of how the claimed injury was caused; proof of causation cannot rest on conjecture, and the mere possibility of such causation is not enough to sustain the plaintiff's burden of proof." <u>Dumont v. United States</u>, 80 F. Supp. 2d 576, 581 (D.S.C. 2000) (citing <u>Walstad v. Univ. of Minn. Hosps.</u>, 442 F.2d 634 (8th Cir. 1971)). Using <u>Dumont</u> as a guidepost, the question becomes whether the Plaintiff can factually establish that the accident resulted in the injuries of which he now complains.

6. In a bench trial, it is "for the court, as trier of fact, to resolve any issue of credibility." <u>Moore Elec. Supply v. Ward</u>, 450 S.E.2d 96, 98 (S.C. Ct. App. 1994). Taking into consideration the many instances where the Plaintiff has made either contradictory statements or false statements at various stages of this case, and even admitted to omitting pertinent information, it is impossible to lend full credibility, or even a modicum of credibility, to his statements.

7. Although the parties agree that the five professionals who treated the Plaintiff and testified on his behalf were not fully informed of his entire medical history, the parties still dispute the admissibility of that testimony. Under the Federal Rules of Evidence,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient



18

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid.702.

8. The Defendant contends that the testimony of Drs. Stoddard, Carey, Mihelic, Eline, and Eller cannot meet requirement (1) above, because they did not have the Plaintiff's complete medical history at the time they rendered their opinion as to causation. For the purposes of this issue, it will be assumed these doctors can testify as experts, inasmuch as their knowledge and experience will assist this Court in understanding the evidence or determining facts in issue. Their opinions may be less helpful to this Court, however, than opinions formed with the benefit of full knowledge of the Plaintiff's medical history and information.

9. The medical testimony indicates that the Plaintiff indeed suffers from some neck and back pain. But even the specific injuries as diagnosed by the various doctors is contradictory: although Dr. Eline believed at the time of the 2001 MRIs that the source of the pain was the disc between lumbar four and five, this condition did not exist on the 1997 MRI. And although one or more of the doctors believe the Plaintiff suffers from a herniated disc, a bulging disc, disc dessication, lumbar disc degenerative disease, joint space narrowing in the neck with some bone spurs at the lower spinal vertebrae, or a combination thereof, these doctors based their opinions as to the causality of the injuries on the very abridged medical history the Plaintiff gave them.



10. Causation in fact cannot be established in this case because the doctors who testified on behalf of the Plaintiff stated that there were possible causes of his

19

injuries <u>other than</u> the accident he related to them. Thus, even though these doctors related some injury to the accident based their limited information, most of them stipulated that the Plaintiff's injuries could be caused by one of a number of other traumatic incidents that the Plaintiff experienced before or after the accident, or by the type of work he did.

11. The testimony of Dr. Johnson, the only doctor who testified with a full knowledge of the Plaintiff's medical history, also militates against a finding of causation in fact. Dr. Johnson testified that he could not state to a reasonable degree of medical certainty that the Plaintiff's injuries were a direct result of the motor vehicle accident.  He also testified that he could not state that, but for the accident, the Plaintiff would not be experiencing the same injuries. Dr. Johnson did, however, agree with Dr. Stoddard's diagnosis of a lumbar sprain/strain and a 10% impairment rating. Dr. Stoddard assigned this impairment rating based upon the Plaintiff's subjective complaints of pain, and not solely on the fact that the Plaintiff had been in a car accident.

12. Because the Plaintiff sustained so many other injuries, because his doctors established causation based on incomplete information, because the doctors posit so many other <u>possibilities</u> of causation, and because the testimony of the Plaintiff lacks any credibility, the Court does not believe that the accident was the cause in fact of the Plaintiff's injuries. Since the Plaintiff has failed to prove causation in fact, a required element in the conjunctive test for proximate cause, he is not entitled to recovery on his complaint.

## JUDGMENT

Based on the foregoing, it is

ORDERED AND ADJUDGED as follows:

1. the Plaintiff has failed to prove that any alleged condition from which he suffers is a proximate result of negligence on the part of the agent of the Defendant;

2. the Plaintiff's complaint be, and the same hereby is, dismissed, and he shall take nothing thereby;

3. the Clerk of Court shall issue a judgment in the Defendant's favor;

4. each side shall pay its own costs; and

5. this matter is ended.

**IT IS SO ORDERED**.

Sol Blatt, Jr.
Senior United States District Judge

July 5, 2005
Charleston, S.C.



21